COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

V

ANNIE MARIE HUMPHRIES,

        Defendant-Appellant.

UNPUBLISHED
September 15, 2015

No. 320633
Wayne Circuit Court
LC No. 13-001382-FC

---

Before: WILDER, P.J., and SHAPIRO and Ronayne KRAUSE, JJ.

PER CURIAM.

A jury convicted defendant of unarmed robbery, MCL 750.530,[1] and first-degree home invasion, MCL 750.110a(2). The trial court sentenced her as a fourth habitual offender, MCL 769.12, to prison terms of 6 to 20 years for the robbery conviction, and 10 to 25 years for the home invasion conviction, to be served concurrently. Defendant appeals as of right. We affirm defendant's convictions and sentences, but remand for correction of the presentence investigation report ("PSIR") and the sentencing information reports ("SIRs").

I

Defendant's convictions arise out of her role in the robbery of 81-year-old Robert Jones inside his Highland Park apartment on January 6, 2013. At trial, the prosecution's theory was (1) that defendant aided and abetted an unknown man who entered the victim's apartment, demanded money, and took $85, based on her knowledge that Jones left his apartment door unlocked so that others could enter to assist him, and (2) that defendant decided to rob the victim after he refused to loan her money.

According to Jones's testimony, defendant, who lived in Jones's apartment complex, entered his apartment at approximately 6:00 or 7:00 p.m. by simply opening the door, which she usually did because she was a good friend of Jones's girlfriend, who was Jones's caretaker. Jones left the door open for his girlfriend because he did not have an extra key for her.

---

[1] Defendant was charged with armed robbery, MCL 750.529. The jury convicted her of the lesser offense of unarmed robbery.

Defendant said to Jones, "Bob, let me have $2.00," and Jones replied that he did not have $2. She repeated her request, and Jones again told her that he did not have any money. Defendant then left, closing the door behind her.

A few seconds after defendant left Jones's apartment, the door opened again and a man walked in. Jones did not see what the man looked like, as his face was covered with the arm of a lighter-colored coat or jacket. The man said, "Bob, give me all of your money." Because the man called Jones by his name, Jones thought that he might know the man. Jones initially thought the man was joking, but he then saw that the man had a knife in his left hand. Jones, who was in a wheelchair, became afraid and did not want the man to get behind him, so he kept moving to keep the man in front of him. Jones refused to give the man any money, but the man took $85 from Jones's pocket. Subsequently, Jones refused to accompany the man into the hallway. The man swung the knife at him; when Jones put up his arm to keep his face from being cut, the blade cut his right wrist. Jones then went downstairs, and a woman there encouraged him to call the police. Highland Park Police Officers Adam Lewis and Lisa Schultz responded to the call.

After the incident, Detective Paul Thomas, the officer in charge, spoke with the apartment building manager, Ayana Nichols, and learned that surveillance footage was available from cameras placed in common areas in the apartment building. The surveillance footage was recorded on a computer system. After speaking with Nichols, Thomas did not believe that he would be able to obtain a copy of the original footage directly from the surveillance system. Thomas also learned that the footage would be saved for only six days before the system would automatically record over the old footage. In order to preserve the footage, Thomas's partner, Detective Terrell Shaw, held his tablet up to the surveillance system's video screen and used the tablet to record the surveillance video; the officers believed, given the time constraints, that this was the best way to preserve the evidence.[2]

At trial, defendant moved in limine to exclude the recording under the best evidence rule. The trial court denied defendant's motion in limine, and the prosecution presented the recording of the surveillance footage from the tablet. According to Thomas's testimony, he viewed the original version and the version recorded on the tablet, determining that they appeared to be the

---

[2] At trial, Nichols testified that she did not believe that copies could be made from the building's surveillance equipment because there was no way to plug in a cord to attach it to a computer or another recording device, and the surveillance system did not have a disc that could be removed. Nichols contacted the corporate office and the persons who installed the system, and she was advised that there was no way to make a direct copy of the recording. She testified that the manner in which Officer Terrell Shaw created a copy, i.e., by recording the surveillance footage with another device as the video played on the surveillance system, was the only known way to produce or save a copy of the recording. Thomas admitted during his trial testimony that he did not directly contact the company responsible for maintaining the recording equipment to ask about obtaining a copy and acted in reliance on Nichols's statements regarding the availability of copies.

same; everything that he had seen on the original system was captured by Shaw's recording. He did not believe that anything on the recording had been altered, and he denied changing anything on the recording made by Shaw. The date and time on the original recording corresponded to the date and time of the offense. Nichols viewed the copy of the recording made on Shaw's tablet and believed that nothing had been altered from the original version; the only difference was that the date and timestamps were more visible on the original recording. Likewise, Nichols viewed the recording at trial and confirmed that it was the same footage captured by the surveillance system.

Thomas also testified regarding the events that transpired on the surveillance video.[3] He indicated that the recording showed defendant letting a person into the building, walking and getting on an elevator with that person, entering and exiting her apartment with the same person, and then getting on the elevator again to go to another floor. Based on the video, Thomas testified that he believed that defendant was associated with the other person and that defendant did not knock before entering Jones's apartment. Thomas testified that Nichols told him that she was only able to identify defendant in the video, not the man who was with defendant. Thomas indicated that the recording did not show the events that occurred inside Jones's apartment, but the recording showed the unidentified man leaving the building on his own, without defendant.

Nichols also provided testimony regarding the activities depicted on the surveillance video, narrating the events as the jury viewed the recording and identifying particular aspects of the building and its layout. She explained that the recording initially showed the building's parking lot and a side stairwell. Next, the recording showed defendant letting someone into the building through the side door and walking up the stairs behind the man. The video showed that the man exited the elevator at the same time that defendant got off and followed her into an apartment rather quickly; Nichols stated that they went into the apartment where defendant was living with her boyfriend's father. After staying in the apartment for a brief period, defendant and the man left the unit and entered the elevator on the fourth floor. The man got off somewhere between the fifth and seventh floors, while defendant rode up to the eighth floor, where Jones lived. When the man entered the elevator, he was wearing dark clothing, but when he exited, he was wearing a white hooded shirt. He walked down the hallway in the direction of a stairwell, which anyone could enter without a key or swipe card. When defendant subsequently exited the elevator, she was carrying a bag with something in it. After checking the surveillance cameras picturing the elevators on all of the other floors, Nichols determined that defendant and the man were the only two people who entered that particular elevator. Nichols explained that the recording then showed defendant walking toward the end of the hallway, where Jones's apartment was located. Defendant entered Jones's apartment for about 15 to 20 seconds and then walked back out, looking back to her left as she exited. Nichols then testified that the recording showed a man in a white hooded jacket leaving Jones's apartment and exiting down a stairwell to a vehicle parked outside. Nichols indicated that there was video footage showing where defendant went after she entered the elevator for the second time, but that footage was not recorded on the tablet.

---

[3] It does not appear from the record that Thomas provided this testimony while the jury viewed the video.

Lewis also testified regarding his conversation with Jones when Lewis arrived at the location following the incident:

> *Q.* What was the nature of the conversation you had first in the lobby?
>
> *A.* Basically what had occurred. And he had stated that he believed that another resident at the location had kind of set him up to get money stolen from him while he was in his apartment.
>
> * * *
>
> *Q.* All right, now. Based on -- without telling me what he said at this point -- based on what he told you, did you determine that there were some persons that you wanted to try to find and speak to?
>
> *A.* That is correct.
>
> *Q.* And was one of those persons a female by the name of Annie Humphries?
>
> *A.* Yes.
>
> *Q.* Why was that, based on what Mr. Jones told you, that you wanted to speak to Ms. Humphries?
>
> *A.* Well, he had stated that -- when I originally spoke with him -- that Ms. Humphries had walked into his apartment unannounced, requested $2.00 to purchase some alcohol.
>
> He had stated that he informed Ms. Humphries that he did not have the $2.00.
>
> At that point he states that Ms. Humphries exited. And as soon as she had exited his apartment door, in came Suspect 1, the unidentified black male that basically had his face covered, and stated, knew him by name.
>
> Told Bob, "Give me your money, Bob. Give me your money."
>
> And he stated basically that he felt the two of them were involved in this together, Ms. Humphries and this unidentified suspect.
>
> *Q.* And that was the reason that you wanted to speak to Ms. Humphries?
>
> *A.* That's correct.

At sentencing, the defense only identified one factual issue in the PSIR, indicating that defendant had no recollection of the 1992 misdemeanor conviction of possession of counterfeit bank or municipal bills that was listed under her adult history. Although the prosecution indicated that it had no problem with the trial court striking the misdemeanor from the PSIR, the

-4-

trial court decided not to strike the conviction because the misdemeanor did not affect defendant's sentencing guidelines. The court stated, "[W]e'll note on the record here that the defendant contests that she has this. And it's noted, duly noted for the record so that in the future she can challenge it if she gets information or proof that it's not her." Following this exchange, the trial court noted that it only received sentencing guidelines for the first-degree home invasion conviction, so it made a copy of the SIR for that conviction and created a second SIR for the unarmed robbery conviction. Defendant did not raise any objections to the trial court's scoring of the sentencing guidelines, including the gaps between her previous convictions, which she committed between 1992 and 2008.

After filing her claim of appeal, defendant filed three motions to remand. Her first motion requested, *inter alia*, a *Ginther*[4] hearing and an evidentiary hearing concerning the scoring of the sentencing guidelines, which this Court denied. *People v Humphries*, unpublished order of the Court of Appeals, entered November 25, 2014 (Docket No. 320633). This Court also denied her second motion, filed *in propria persona*, which requested a *Ginther* hearing regarding the claims raised in her Standard 4 brief. *People v Humphries*, unpublished order of the Court of Appeals, entered January 9, 2015 (Docket No. 320633). Finally, this Court denied defendant's third motion to remand, filed through her attorney, which concerned the trial court's imposition of court costs. *People v Humphries*, unpublished order of the Court of Appeals, entered March 31, 2015 (Docket No. 320633).

On appeal, defendant raises two issues in her principal brief on appeal and three issues in her Standard 4 brief. We will address each issue separately.

II

Defendant first argues that the trial court erred in admitting the tablet recording of the original video footage. She argues that this evidence was not admissible under the best evidence rule. We disagree.

A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion, but any preliminary questions of law regarding the admissibility of evidence, such as whether a rule of evidence bars admission, are reviewed de novo. *People v McDade*, 301 Mich App 343, 352; 836 NW2d 266 (2013). An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes. *People v Yost*, 278 Mich App 341, 353; 749 NW2d 753 (2008).

MRE 1002 provides, "To prove the content of a . . . recording, . . . the original . . . recording . . . is required, except as otherwise provided by these rules or by statute." Under MRE 1003, "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." MRE 1004 states, in pertinent part:

---

[4] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

The original is not required, and other evidence of the contents of a . . . recording . . . is admissible if –

(1) *Originals Lost or Destroyed.* All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith; or

(2) *Originals Not Obtainable.* No original can be obtained by any available judicial process or procedure; . . .

Here, because the original surveillance video was recorded on a system that was not capable of being copied or preserved, and the testimony shows that the tablet recording appeared to be the same as the original surveillance video, the tablet recording of the original video footage qualified as other evidence of the contents of the original, and the trial court did not abuse its discretion in admitting the tablet video under MRE 1004(2).

To the extent that defendant challenges the authenticity of the recording shown to the jury, we also reject this argument. MRE 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." MRE 901(b)(1) provides that authentication or identification can be proved by witness "[t]estimony that a matter is what it is claimed to be." The prosecutor offered the tablet recording as evidence of the contents of the original surveillance footage of the events surrounding the charged offense. The evidence that the police used a tablet device to record the original surveillance video, and the testimony of Nichols and Thomas that they viewed both versions and they appeared to be the same, was sufficient to authenticate the tablet recording as a copy of the original. Defendant's contention that the recording method used by the police was questionable or unreliable does not affect the admissibility of the evidence, but only its weight, which was for the jury to decide. See *People v Berkey*, 437 Mich 40, 52; 467 NW2d 6 (1991).

III

Next, defendant challenges the scoring of the sentencing guidelines. As a preliminary matter, we recognize that the holdings of the Michigan Supreme Court's recent decision in *People v Lockridge*, ___ Mich ___; ___ NW2d ___ (2015) (Docket No. 149073), are now potentially outcome-determinative as to any challenge concerning the sentencing guidelines. In *Lockridge*, the Court held that "the rule from *Apprendi v New Jersey*, 530 US 466; 120 S Ct 2348; 147 L Ed 2d 435 (2000), as extended by *Alleyne v United States*, 570 US ___; 133 S Ct 2151; 186 L Ed 2d 314 (2013), applies to Michigan's sentencing guidelines and renders them constitutionally deficient," *id*. at ___; slip op at 1, meaning that "to the extent that the OVs scored on the basis of facts not admitted by the defendant or necessarily found by the jury verdict increase the floor of the guidelines range, i.e. the defendant's 'mandatory minimum' sentence, that procedure violates the Sixth Amendment," *id*. at ___; slip op at 11. Accordingly,

[t]o remedy the constitutional violation, [the Court] sever[ed] MCL 769.34(2) to the extent that it makes the sentencing guidelines range as scored on the basis of facts beyond those admitted by the defendant or found by the jury beyond a reasonable doubt mandatory. [The Court] also str[uck] down the requirement in

-6-

MCL 769.34(3) that a sentencing court that departs from the applicable guidelines range must articulate a substantial and compelling reason for that departure. [*Id.* at ___; slip op at 2.]

The Court also stated:

[A] guidelines minimum sentence range calculated in violation of *Apprendi* and *Alleyne* is advisory only and that sentences that depart from that threshold are to be reviewed by appellate courts for reasonableness. To preserve as much as possible the legislative intent in enacting the guidelines, however, we hold that a sentencing court must determine the applicable guidelines range and take it into account when imposing a sentence. [*Id.* ___; slip op at 2 (citations omitted).]

Likewise, the Court indicated that "[o]ur holding today does nothing to undercut the requirement that the highest number of points possible *must be* assessed for all OVs, whether using judge-found facts or not." *Id.* at ___; slip op at 29 n 28. Therefore, we conclude that, given the continued relevance of the scoring variables to the Michigan sentencing scheme, the standards of review traditionally applied to the trial court's scoring of the variables remain viable after *Lockridge*.

Defendant preserved her challenges to the scoring of offense variables ("OV") 1 and 2 and prior record variables ("PRV") 1, 2, 5, and 6 by challenging the scoring of these variables in a timely motion to remand.[5] MCR 6.429(C); *People v McChester*, ___ Mich App ___; ___ NW2d ___ (2015) (Docket No. 318145); slip op at 2. When reviewing a trial court's scoring decision, the trial court's "factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id.*

Initially, we reject defendant's argument that the trial court's scoring of the prior record variables was premised on its improper consideration of prior convictions that were barred by the 10-year gap rule. MCL 777.50 provides, in relevant part:

(1) In scoring prior record variables 1 to 5, do not use any conviction or juvenile adjudication that precedes a period of 10 or more years between the discharge date from a conviction or juvenile adjudication and the defendant's commission of the next offense resulting in a conviction or juvenile adjudication.

(2) Apply subsection (1) by determining the time between the discharge date for the prior conviction or juvenile adjudication most recently preceding the commission date of the sentencing offense. If it is 10 or more years, do not use

---

[5] As explained *infra*, to the extent that defendant raises a claim on *Apprendi/Alleyne* grounds, this argument unpreserved.

that prior conviction or juvenile adjudication and any earlier conviction or juvenile adjudication in scoring prior record variables. If it is less than 10 years, use that prior conviction or juvenile adjudication in scoring prior record variables and determine the time between the commission date of that prior conviction and the discharge date of the next earlier prior conviction or juvenile adjudication. If that period is 10 or more years, do not use that prior conviction or juvenile adjudication and any earlier conviction or juvenile adjudication in scoring prior record variables. If it is less than 10 years, use that prior conviction or juvenile adjudication in scoring prior record variables and repeat this determination for each remaining prior conviction or juvenile adjudication until a period of 10 or more years is found or no prior convictions or juvenile adjudications remain.

(3) If a discharge date is not available, add either the time defendant was sentenced to probation or the length of the minimum incarceration term to the date of the conviction and use that date as the discharge date.

(4) As used in this part:

* * *

(b) "Discharge date" means the date an individual is discharged from the jurisdiction of the court or the department of corrections after being convicted of or adjudicated responsible for a crime or an act that would be a crime if committed by an adult.

As further discussed below, the trial court did not consider defendant's oldest conviction, a 1992 misdemeanor conviction for possession of counterfeit bank or municipal bills. Defendant's next oldest conviction was a 1992 plea-based conviction for first-degree retail fraud, MCL 750.356c, for which she received a delayed sentence. In 1996, she was sentenced to one year in the county jail for that conviction, and she has not had a 10-year period free of any convictions since then. In 2004, she was convicted, after pleading *nolo contendere*, of larceny from a person, MCL 750.357, and was sentenced to two years' probation. In 2004, defendant was also convicted of possession of less than 25 grams of a controlled substance, MCL 333.7403(2)(a)(*v*), and stealing, taking, or removing a financial transaction device, MCL 750.157n; she was sentenced to 60 days in jail and two years' probation. In 2005, she was convicted of jail escape committed by a person lawfully imprisoned for a felony, MCL 750.195(2), and sentenced to 11 months in jail. In 2008 and 2009, she was sentenced for drug possession, MCL 333.7403(2)(a)(*v*), and attempted uttering and publishing, MCL 750.249, MCL 750.92, respectively. The instant offense was committed in 2013. Because defendant never had a 10-year gap between the discharge date from a conviction and the commission date of the next offense resulting in a conviction, the trial court did not err in considering defendant's criminal record dating back to her first-degree retail fraud conviction.

Defendant argues that the trial court erred in relying on a 1992 misdemeanor conviction for possession of counterfeit bank or municipal bills to assess two points for PRV 5. See MCL 777.55(1)(e) (stating that two points should be scored if the offender has one prior misdemeanor conviction or juvenile adjudication). Defendant challenged the accuracy of that conviction at

sentencing. Although the prosecutor conceded that she did not have any information to verify the conviction and agreed that it could be stricken, the trial court decided not to strike it or change the scoring of PRV 5; instead, it noted for the record that defendant was contesting the conviction and that the conviction did not affect defendant's guidelines range. Because defendant challenged the conviction, the trial court was required to make a finding regarding its accuracy, or determine that a finding was not necessary because it was irrelevant. *People v Waclawski*, 286 Mich App 634, 689-690; 780 NW2d 321 (2009). If information is found to be inaccurate or irrelevant, it must be corrected or stricken from the PSIR. *Id.* at 690. The trial court effectively determined that the prior misdemeanor conviction was not relevant by concluding that "it [did not] affect the ultimate guidelines," but it erred by refusing to strike it or change the two-point score for PRV 5, as suggested by the prosecutor.

In the alternative, the prosecution argues that defendant's conviction for first-degree retail fraud, MCL 750.356c, can be used to support the two-point score for PRV 5. We disagree. First-degree retail fraud is not a misdemeanor, but rather a class E felony. See MCL 777.16r. Although the PSIR indicates that defendant has another misdemeanor conviction for possession of an altered driver's license, MCL 257.324, that conviction does not qualify for scoring under PRV 5 because it was not an offense against a person or property, a controlled substance or weapon offense, MCL 777.55(2)(a), or an offense arising from the operation of a vehicle while under the influence of alcohol or a controlled substance, MCL 777.55(2)(b). Accordingly, neither conviction could be used to support the trial court's scoring of PRV 5.

Although the trial court erred in scoring two points for PRV 5, the error does not require resentencing because the score does not affect defendant's guidelines range. Defendant received a total PRV score of 77 points, placing her in PRV Level F (75+ points) for each of her convictions. See MCL 777.63 (home invasion); MCL 777.64 (unarmed robbery). A two-point reduction for PRV 5 would reduce defendant's total PRV score from 77 points to 75 points, but would not change her placement in PRV Level F. Because the scoring error does not affect the appropriate guidelines range, resentencing is not warranted. *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006). However, because the trial court effectively disregarded the prior conviction for possession of counterfeit bank or municipal bills, defendant is entitled to have it stricken from the PSIR, *People v Thompson*, 189 Mich App 85, 88; 472 NW2d 11 (1991),[6] and to have the two-point score for PRV 5 deleted from the SIRs for both convictions, *People v Melton*, 271 Mich App 590, 593, 596; 722 NW2d 698 (2006), superseded by statute on other grounds. Accordingly, we remand for that purpose.

Defendant next argues that the trial court erred in scoring 10 points for PRV 6, which considers the offender's status at the time of the offense. MCL 777.56(1)(c) provides that the trial court shall assess 10 points if "[t]he offender is on parole, probation, or delayed sentence status or on bond awaiting adjudication or sentencing for a felony." The PSIR states that "[a]t

---

[6] Although "[t]he failure to strike disregarded information can be harmless error," *Waclawski*, 286 Mich App at 690, we find that remand is necessary to correct both the PSIR and the SIRs.

the time of the within offense, the defendant was on probation for Attempt Uttering and Publishing." Defendant asserts that she was sentenced to two years' probation for that offense in 2009, which would have ended before she committed the instant offense, but she has not provided any factual support for her assertion. Although the PSIR states that defendant pleaded guilty to attempted uttering and publishing in January 2009, and was sentenced to probation in February 2009, the PSIR does not list the term of probation, and it indicates that defendant was discharged without improvement *after* her arrest for the instant offense. "There is a presumption that the information contained in the PSIR is accurate unless the defendant raises an effective challenge." *People v Lloyd*, 284 Mich App 703, 705; 774 NW2d 347 (2009). Defendant did not challenge the accuracy of this information at sentencing. Therefore, because this unchallenged information indicates that defendant was not discharged from probation until after she committed the instant offense, we presume that this information is accurate and conclude that the trial court did not err in scoring 10 points for PRV 6.

Defendant's challenges to the scoring of PRV 1 and PRV 2 are based on her contention that the trial court improperly scored the variables in reliance on prior convictions that could not be considered under the 10-year gap rule, MCL 777.50. As discussed previously, there was not a 10-year gap between the discharge date of any of defendant's prior convictions and the commission date of the next offense resulting in a conviction.[7] Thus, the trial court properly scored PRV 1 and PRV 2.

Defendant also argues that the trial court erred in assessing five points for OV 1 and OV 2. MCL 777.31(1)(e) authorizes a five-point score for OV 1 if "[a] weapon was displayed or implied." The instructions provide that "[i]n multiple offender cases, if 1 offender is assessed points for the presence or use of a weapon, all offenders shall be assessed the same number of points." MCL 777.31(2)(b). MCL 777.32 authorizes a five-point score for OV 2 if "[t]he offender possessed or used a . . . knife or other cutting or stabbing weapon." Like OV 1, the instructions for OV 2 provide that "[i]n multiple offender cases, if 1 offender is assessed points for possessing a weapon, all offenders shall be assessed the same number of points." MCL 777.32(2).

Defendant argues that OV 1 and OV 2 should not have been scored because the jury implicitly rejected the fact that a weapon was involved in the offense when it acquitted her of

---

[7] The record indicates that 25 points were properly scored for PRV 1, MCL 777.51(1)(c) (authorizing a score of 25 points if the offender has one prior high severity felony conviction), on the basis of defendant's prior conviction for larceny from a person, MCL 750.357, which is a Class D felony, see MCL 777.16r, and, thus, qualifies as a high severity felony conviction, MCL 777.51(2)(a). In addition, 30 points were properly scored for PRV 2, MCL 777.52(1)(a) (authorizing a score of 30 points if the defendant has four or more prior low severity felony convictions), given defendant's prior convictions for two counts of possession of less than 25 grams of a controlled substance, MCL 333.7403(2)(a)(*v*), escape from jail while serving a felony sentence, MCL 750.195(2), attempted uttering and publishing, MCL 750.249, MCL 750.92, and first-degree retail fraud, MCL 750.356c. See MCL 777.52(2)(a).

armed robbery. However, whereas the jury was precluded from convicting defendant of armed robbery absent proof beyond a reasonable doubt, facts at sentencing need only be proven by a preponderance of the evidence. *Hardy*, 494 Mich at 438. Because of the different standards of proof, "situations may arise wherein although the factfinder declined to find a fact proven beyond a reasonable doubt for purposes of conviction, the same fact may be found by a preponderance of the evidence for purposes of sentencing." *People v Ratkov (After Remand)*, 201 Mich App 123, 126; 505 NW2d 886 (1993). Moreover, in interpreting the same multiple offender language in MCL 777.31 and MCL 777.33, the Michigan Supreme Court stated, "When the sentencing court assesses points for the first offender, it must assess the 'highest number of points' that can be assessed under the statute." *People v Morson*, 471 Mich 248, 260; 685 NW2d 203 (2004). As such, in multiple offender cases, conduct attributable to another offender is properly considered in the scoring of OV 1 and OV 2, given that the same score must be assessed for all offenders. See *id*. at 252-253, 259-260. Jones testified that the man who robbed him possessed a knife during the offense, which he used to cut the victim's wrist. This testimony provided a preponderance of evidence in support of the five-point scores for OV 1 and OV 2. *Hardy*, 494 Mich at 438.

Although defendant does not expressly raise a constitutional challenge on *Apprendi/Alleyne* grounds to the trial court's scoring of OV 1 and OV 2, defendant's argument on appeal does contend that the trial court utilized facts not found beyond a reasonable doubt by the jury or admitted by defendant in order to score OV 1 and OV 2. Thus, to the extent that defendant's challenge to her sentences can be construed as an *Apprendi/Alleyne* claim, our review is for plain error affecting substantial rights because "defendant did not object to the scoring of the OVs at sentencing on *Apprendi/Alleyne* grounds." *Lockridge*, ___ Mich at ___; slip op at 30.

It is apparent that the trial court utilized facts that were not established by the jury's verdict or admitted by defendant in establishing scores for OV 1 and OV 2. And, therefore, a constitutional error in violation of the Sixth Amendment resulted, regardless of whether this error had a substantive effect on defendant's sentences. *Lockridge*, ___ Mich at ___; slip op at 31 n 30. Nevertheless, despite this constitutional error, defendant cannot demonstrate prejudice from the trial court's assessment of five points for OV 1 and OV 2 because a reduction of 10 points would not affect the appropriate guidelines range. See *id*. at 31 n 30 ("[W]hether [an] error actually increases the floor of a defendant's minimum sentence range under the guidelines is only relevant to the question of whether the defendant has suffered any prejudice."), 32-33, 36; see also *Francisco*, 474 Mich at 89 n 8 ("Where a scoring error does not alter the appropriate guidelines range, resentencing is not required."). Defendant received a total OV score of 20 points, placing her in OV Level II (10 to 24 points) on the applicable sentencing grids. MCL 777.63 (home invasion); MCL 777.64 (unarmed robbery). Even with a 10-point reduction,

defendant's OV score would remain in OV Level II; accordingly, defendant is not entitled to resentencing.[8]

Defendant also argues that defense counsel provided ineffective assistance when she failed to object to the aforementioned sentencing errors. We disagree.

Because defendant did not raise an ineffective assistance of counsel claim in the trial court, and this Court denied her motion to remand for a *Ginther* hearing, our review is limited to errors apparent from the record. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

> Effective assistance of counsel is presumed, and defendant bears a heavy burden of proving otherwise. To demonstrate ineffective assistance, defendant must show: (1) that his attorney's performance fell below an objective standard of reasonableness, and (2) that this performance so prejudiced him that he was deprived of a fair trial. "To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." [*People v Gaines*, 306 Mich App 289, 300; 856 NW2d 222 (2014) (citations omitted).]

Defendant cannot establish that she was prejudiced by defense counsel's failure to object to the trial court's assessment of points for PRV 5, OV 1, and OV 2 because the scores did not affect defendant's sentencing guidelines and, as a result, did not affect the outcome of the proceedings. Additionally, as discussed *supra*, PRV 1, PRV 2, PRV 6 were properly scored. Defense counsel was not ineffective for failing to raise futile objections. *People v Unger*, 278 Mich App 210, 256; 749 NW2d 272 (2008).

IV

Defendant argues in her Standard 4 brief that by failing to produce the original surveillance video, the prosecution violated its duty under *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), to disclose all exculpatory evidence. Defendant also claims that the police acted in bad faith when they failed to preserve potentially useful evidence in violation of *Arizona v Youngblood*, 488 US 51; 109 S Ct 333; 103 L Ed 2d 281 (1988), and *California v Trombetta*, 467 US 479; 104 S Ct 2528; 81 L Ed 2d 413 (1984). We disagree.

Although defendant objected to the admission of the tablet recording at trial, the objection was based only on the best evidence rule; defendant did not raise a *Brady* issue in the trial court or challenge whether the officers acted in good faith.[9] An objection on one ground is

---

[8] We conclude that we need not separately review defendant's sentence for reasonableness because defendant's sentences did not depart from the applicable guidelines range. See *Lockridge*, ___ Mich at ___; slip op at 2, 28-29, 36.

[9] For the reasons previously discussed in Part II, *supra*, we reject defendant's argument in her Standard 4 brief that admission of the tablet recording violated the best evidence rule.

insufficient to preserve an appellate challenge based on a different ground. *People v Bulmer*, 256 Mich App 33, 35; 662 NW2d 117 (2003). Accordingly, defendant's arguments are unpreserved, and our review is limited to plain error affecting defendant's substantial rights. *People v Carines,* 460 Mich 750, 763; 597 NW2d 130 (1999); *People v Cox,* 268 Mich App 440, 448-450; 709 NW2d 152 (2005). To demonstrate such an error, the defendant must show that (1) an error occurred, (2) the error was clear or obvious, and (3) "the plain error affected [the defendant's] substantial rights," which "generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763.

There is no merit to defendant's arguments. To establish a *Brady* violation, a defendant must show that (1) the prosecution suppressed evidence; (2) the evidence is favorable to the accused; and (3) viewed in its totality, the evidence is material. *People v Chenault,* 495 Mich 142, 155; 845 NW2d 731 (2014). To establish a due process violation on the basis of a failure to preserve evidence, a defendant must demonstrate that the state acted in bad faith and that the evidence was potentially exculpatory. *People v Heft*, 299 Mich App 69, 79; 829 NW2d 266 (2012), citing *Youngblood*, 488 US at 57-58.

There is no indication in the record that the police suppressed, destroyed, or lost any evidence. On the contrary, the record shows that the police acted to preserve evidence after discovering that the apartment building's video surveillance system did not have a removable disk or a connection whereby the original recording could be transferred to another recording device, and that the system would automatically record over the original recording after six days. A copy of that recording was provided to the defense.

Further, there is no record support for defendant's argument that portions of the original recording were omitted from the tablet copy. Although the date and timestamps did not clearly appear on the tablet copy, both Nichols and Thomas testified that they viewed both versions and that they appeared to be the same, and Thomas testified that the tablet recording contained the entirety of the original with respect to the events surrounding the charged offense. Defendant has not identified any evidence indicating that there were portions of the original recording that depicted events related to the charged offense that were not included in the tablet recording; in support of her position, she only provides a description in her Standard 4 brief of her movements on the day of the incident, which is not supported by the evidence in the record, and notes Nichols's testimony confirming that video surveillance of defendant leaving the elevator for the second time was not included in the tablet recording. Contrary to defendant's characterization of the officers' purported failure to preserve portions of the surveillance video, we find no indication of intentional suppression of evidence or bad faith in the record. See *Youngblood*, 488 US at 58; see also *People v Johnson*, 197 Mich App 362, 365; 494 NW2d 873 (1992). Accordingly, defendant has failed to establish that the prosecution withheld exculpatory evidence, or that the police failed to preserve potentially exculpatory evidence in bad faith.

V

Next, defendant argues in her Standard 4 brief that it was improper for Thomas and Nichols to testify regarding matters depicted in the video. During their testimony, the witnesses described the layout of the building and locations depicted in the video and referred to defendant's appearances in the video. Defendant challenges this testimony under MRE 701,

which provides that "[i]f [a] witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." She also argues that the witnesses' testimony invaded the province of the jurors, who were able to view the video themselves to determine what it portrayed. Defendant concedes that there was no objection to the challenged testimony at trial. Accordingly, this issue is unpreserved, and review is limited to plain error affecting defendant's substantial rights. *Carines,* 460 Mich at 763.

Defendant has failed to show a plain error affecting her substantial rights. First, the witnesses' commentary regarding the layout of the building and locations depicted in the video was based on their perceptions of the video and their previous knowledge of the apartment building, which was helpful for the jury to understand events depicted in the video. In this case, Nichols and Thomas both had personal knowledge of the layout, as Nichols was familiar with the building because she was the building manager, and Thomas was familiar with the building due to his investigation of the offense. Additionally, it is evident that Nichols and Thomas both had personal knowledge of the surveillance footage on the recording. MRE 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Both were in a better position than the jury to identify the locations of events depicted in the video. This was helpful to the jury because of the multiple views of different floors of the building. As such, their testimony was admissible under MRE 701 to help the jury understand the evidence and did not invade the province of the jury. *People v Fomby,* 300 Mich App 46, 53; 831 NW2d 887 (2013).

Second, it was not inappropriate for Nichols to point out or identify defendant on the recordings. As the manager at defendant's apartment building, Nichols recognized defendant in the video when she first viewed it after the offense. Because she was personally familiar with defendant, her identification testimony did not invade the province of the jury, especially given the lack of clarity in the surveillance video at certain points due to the lighting. See *id*. at 52-53; *United States v Rodriguez-Adorno*, 695 F3d 32, 40 (CA 1, 2012).

However, because there is no indication that Thomas was familiar with defendant before the offense, his testimony identifying defendant arguably constituted plain error. Nevertheless, because Nichols identified defendant when she showed Thomas the video, it is apparent from his testimony, and it would have been clear to the jury, that his references to defendant in the video were based on Nichols's identification testimony. As a result, even if we assume, arguendo, that Thomas's testimony constituted plain error, defendant has not shown that it affected the outcome of the proceedings, as Thomas's testimony was cumulative to, and clearly based on, Nichols's proper identification testimony.

Additionally, defendant argues that the trial court should not have allowed Thomas to offer opinion testimony because his status as a police officer made his testimony particularly persuasive. However, the trial court instructed the jury that testimony from witnesses who are police officers is to be judged by the same standards used to evaluate the testimony of any other witnesses. "Juries are presumed to follow their instructions." *People v Rodgers*, 248 Mich App 702, 717; 645 NW2d 294 (2001). Accordingly, we find no plain error affecting defendant's substantial rights.

## VI

Finally, defendant argues in her Standard 4 brief that trial counsel was ineffective for failing to object to inadmissible testimony. Again, because defendant did not raise an ineffective assistance of counsel claim in the trial court, and this Court denied her motion to remand for a *Ginther* hearing, our review is limited to errors apparent from the lower court record.[10] *Matuszak,* 263 Mich App at 48.

Defendant argues that trial counsel was ineffective for not objecting to Nichols's and Thomas's testimony regarding the building and Nichols's identification testimony. Because we conclude that this testimony was not improper, defense counsel was not ineffective for failing to object. Counsel is not required to make a futile objection. *People v Darden,* 230 Mich App 597, 605; 585 NW2d 27 (1998). Moreover, even if defense counsel arguably should have objected to Thomas's testimony identifying defendant as one of the individuals pictured in the video, defendant has failed to show that he was prejudiced by this purported error for the reasons stated above. *Gaines,* 306 Mich App at 300. Therefore, defense counsel was not ineffective when she failed to object to the lay opinion and narrative testimony.

Defendant also asserts that defense counsel was ineffective for failing to object to Lewis's testimony describing what Jones told him about his encounter with defendant shortly before he was robbed. Defendant argues that the testimony constituted inadmissible hearsay. " 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). "[A] statement offered to show why police officers acted as they did is not hearsay." *People v Chambers,* 277 Mich App 1, 11; 742 NW2d 610 (2007), citing *People v Jackson,* 113 Mich App 620, 624; 318 NW2d 495 (1982). It is apparent from the context of the challenged testimony that it was offered to explain why the police wanted to speak to defendant, not for its truth. Under these circumstances, defense counsel's failure to object was not objectively unreasonable. Any objection would have been futile. *Darden,* 230 Mich App 605.

We affirm defendant's convictions and sentences, but remand for correction of the PSIR and SIRs in accordance with this opinion. We do not retain jurisdiction.

/s/ Kurtis T. Wilder
/s/ Douglas B. Shapiro
/s/ Amy Ronayne Krause

---

[10] Because the record is adequate to address and resolve defendant's ineffective assistance of counsel claims, remand for an evidentiary hearing is not necessary.